IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 9, 2008

## STATE OF TENNESSEE v. CEASAR JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-03240     Chris B. Craft, Judge**

**No. W2008-00111-CCA-R3-CD  - Filed January 8, 2009**

A Shelby County Criminal Court jury convicted the defendant, Ceasar Johnson,[1] of two counts of voluntary manslaughter and one count of attempted voluntary manslaughter. He was sentenced to four and a half years on each of the voluntary manslaughter convictions and three years on the attempted voluntary manslaughter conviction to be served consecutively in the county workhouse, for an effective term of twelve years. On appeal, the defendant argues that: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in denying judicial diversion, probation, or other alternative sentence; and (3) the trial court erred in imposing consecutive sentences. Following our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Marvin E. Ballin, Memphis, Tennessee, for the appellant, Ceasar Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Mary W. François, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rachel Newton and Damon Griffin, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This case arises out of a January 9, 2006, shooting that resulted in the deaths of Mark Collins and Cedric Stanley and the serious injury of Edward Stanley, Jr. On that date, the seventeen-year-old

---

[1] We utilize the spelling of the defendant's name as it appears in the indictment.

defendant shot into a car occupied by the three victims and, as a result, was indicted on two counts of second degree murder and one count of attempted second degree murder. A trial was conducted on the matter in August 2007. The defendant did not contest his responsibility for the shootings, only his degree of culpability.

## State's Proof

Rosalee Stanley, the mother of Cedric and Edward Stanley,[2] testified that Edward owned a red, four-door Cadillac in January 2006. She recalled that during that time period, Edward worked for a temporary employment agency taking various assignments at warehouses and distribution centers, and he lived with his girlfriend about a ten or fifteen minute drive from the scene of the shooting on Mendenhall Road.

Susan Collins Quarterman, Mark Collins' mother, testified that she last saw her son alive the afternoon of January 6, 2006. Collins had spent the holidays with Quarterman in Jacksonville, Florida, and he left that afternoon on a flight back to Memphis. She received a call the following Monday afternoon from Collins' father, informing her that Collins had been shot. Quarterman traveled to Memphis the next morning, and Collins died in the hospital later that day.

Susan Williams testified that on January 9, 2006, around 4:15 p.m., she and her husband were driving south on Mendenhall Road when she noticed a red, four-door car parked in the driveway of a house and heard gunshots. She elaborated:

> As we approached the car[,] I was in the passenger seat just kind of looking around and I noticed the car sitting there with two men standing outside talking to the people in the car. As we're almost on the car, I heard shots and I turned and saw him shooting into the car. And I told my husband to get us out of there that he was shooting and then as he -- they started -- they ran around the end of the car, and I turned and looked at them and watched them as they ran.

Williams noted that the gunman was standing on the passenger side of the car when he fired the shots, and he continued firing as he moved away from the car. She said that the gunman ran around the back of the car and away from the scene while "cupping [the gun] in his hand." She did not see a baseball cap in the gunman's hand. Williams and her husband called 911, drove "a couple houses down," then turned the car around and parked close to the scene. She said that no one got out of the vehicle and none of the car doors were open. Williams estimated that, in total, her eyes were off the scene of the shooting for "[a] minute or two." She agreed that the car was pulled into the driveway in a way that would hinder pedestrian traffic on the sidewalk.

---

[2] Because some of the victims and witnesses share the same last name, we have elected to utilize first names as needed for the purpose of brevity. We intend no disrespect to these individuals.

Jessica Griffin, a resident of Florida, testified that she was in Memphis on January 9, 2006, to attend her aunt's funeral. Griffin, her stepmother, an aunt, and ex-girlfriend were driving "down the street" in a residential area when she heard gunshots. Griffin could not see who fired the shots, but she noticed that two men who had been standing on the passenger side of a red car ran around the back of the car and away from the scene.

Approximately two houses down, the Griffin vehicle made a "U-turn" and pulled up near the car where the shooting occurred. Griffin "jumped out" of their vehicle and went to the driver's side of the other car where she saw a young man in the passenger's side backseat who "was leaned over to the side like he fell to the left." She saw another young man in the front passenger seat with "his tongue . . . hanging out his mouth" in an effort to breathe. She recalled that the driver was awake and talking. She remembered that her stepmother was standing next to her, and her aunt was around the back of the car calling 911. Griffin did not see any weapons in the red car. Griffin was shown a photograph of the red car with the driver's door slightly ajar but said she did not remember whether the door was open. She said that she did not touch the car. Griffin did not know whether the glass in the driver's side window was shattered, but she said she was able to talk to the driver.

Officer Timothy Steele of the Memphis Police Department testified that he responded to the scene of a shooting at 3425 Mendenhall Road on January 9, 2006, around 4:00 p.m. At the scene, Officer Steele saw a maroon Cadillac with, to the best of his knowledge, the front driver's side and passenger's side windows broken out. The car contained three occupants. The passengers were unresponsive, having "obviously" been shot and "extremely critical." However, the driver was responsive and able to relay what had happened. Officer Steele said that all four of the car doors were closed when he arrived. He noted that several witnesses were standing around the scene when he arrived, but he did not see anyone touch the car or remove anything. Officer Steele recalled that emergency medical personnel removed the backseat passenger from the car upon their arrival "to do life saving techniques." He said that eventually all of the occupants were removed from the car to obtain medical treatment.

Lieutenant Gregory Quinn of the Memphis Police Department Motorcycle Squad testified that he was called to a scene at 3425 Mendenhall Road on January 9, 2006. Upon his arrival, Lieutenant Quinn saw a burgundy Cadillac parked in the driveway with the driver still sitting in the car, having suffered a gunshot wound. He remembered that two other passengers had already been taken out of the car in order to receive medical assistance. As the scene supervisor, Lieutenant Quinn had his officers gather witnesses and secure the immediate perimeter of the shooting. They also gathered shell casings, which were stored in a rubber glove for later analysis. Asked if the driver's side door of the Cadillac was open when he arrived as shown in one of the exhibits, Lieutenant Quinn said that the driver was still inside with the car in drive and his foot on the brake. He explained that before they could get the driver out, they had to reach in, put the car in park, and turn off the ignition. He said they did not shut the door once they got the driver out of the car because they did not want to "continually touch[] and mess[] with the vehicle." Other than the paramedics, Lieutenant Quinn did not see anyone else touch the Cadillac.

Edward Stanley, Jr., the surviving victim, testified that he was visiting at his parents' house the afternoon of January 9, 2006, around 3:30 or 3:45 p.m. His brother, Cedric, was also at the house, but he left about five or ten minutes later, saying he had to go down the street but would be right back. Shortly thereafter, Cedric called Edward and said he had just been robbed. In response, Edward and Mark Collins "got in [the] car and rode down the street and picked him up." Cedric told Edward "that the guys [who] had just robbed him . . . [were] two, three houses right down the street."

Edward recalled that they turned onto Mendenhall Road and initially passed two other young men, both wearing black, before they encountered a young man wearing a red shirt, later identified as the defendant, and his companion, who was wearing a brown coat. Edward pulled his car over to the side of the street next to the defendant and his companion, and the defendant and Cedric started arguing. After a few minutes, Edward pulled his car into a nearby driveway because there was heavy traffic on the street. He acknowledged that his car blocked the sidewalk but said that a pedestrian could still get around it.

Edward testified that Collins was sitting in the front passenger seat and Cedric was sitting in the backseat behind Collins. The defendant was standing at the back window where Cedric was sitting, and his companion was on the driver's side, approximately five or ten feet away from the car. Edward recalled that the two windows on the driver's side were up, and the two windows on the passenger's side were "all the way down." Edward and Collins did not get involved in the argument, but the argument appeared to be over the defendant having robbed Cedric of some marijuana. Edward admitted that Cedric was selling marijuana around that time period but said Collins was not. He recalled that "the [defendant] was saying that he didn't do it[,] that somebody else done it and had walked the other way. [Cedric] was telling him, No, it wasn't nobody else, it was him." Edward said that the defendant had a bag of marijuana in his hands and was "saying something about he don't have to rob my brother because that's petty, whatever. He doing his own little thing."

Asked on cross-examination if he remembered telling the police what was stolen from his brother, Edward said, "I told them I wasn't for sure. It was either about some drugs or some money." He acknowledged that in a prior statement to police, he said that Cedric did not say what had been taken from him. He also acknowledged that, in his statement, he told the defendant to give Cedric back his money. Edward explained the inconsistencies in his statements and his testimony, "[A]s I thought about it and just sat down and remembered everything that went on, now I know for sure it ain't no fill in the blanks. Everything is filled in. I know what [the robbery] was and what it wasn't [about,]" and "[i]t was [about] marijuana."

Edward testified that after the argument had been going on for awhile, the defendant's companion walked over to the defendant, mumbled something indiscernible, and the defendant started shooting. After he heard the gunshots, Edward saw that Collins' "head was leaned over[,] . . . blood [was] running[,] . . . [a]nd he just made a little moaning, growling sound." Edward told Cedric to call the police because he could not move from his waist down. Cedric picked up his phone and opened it, but then "his eyes rolled back in the back of his head and he started shaking.

-4-

Then he just . . . fell over to the left in the car." Edward saw the defendant and his companion run down Mendenhall toward some apartments.

Edward stated that the first person to approach the car after the shooting was a police officer, and he did not recall anyone else approaching the car until the paramedics and an ambulance arrived a few minutes later. Edward said he was in the hospital for about two and a half months. He learned of Cedric's and Collins' deaths after three or four days. Edward denied that he, Cedric, or Collins had any weapons the day of the shooting. Edward identified the defendant from a photospread on January 12, 2006.

Agent Steve Scott of the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, accepted as an expert in the field of firearms identification, testified concerning the evidence he received for examination. He received a Beretta nine-millimeter firearm, a magazine for the firearm, four Remington nine-millimeter cartridges, four Winchester nine-millimeter cartridges, and five Winchester nine-millimeter cartridges manufactured under different specifications, all retrieved from a residence at 5205 Ogundquit Lane; a projectile retrieved from Cedric's shoulder during autopsy; a projectile retrieved from Edward's body at the Regional Medical Center; and four fired cartridge cases retrieved from the scene of the shooting. Agent Scott performed tests on the two projectiles and four fired cartridge cases and determined that none of the items had been fired from the Beretta firearm. Agent Scott also examined the two projectiles to determine whether they had been fired from the same weapon. He concluded that the bullets could have been fired from the same gun but said he could not "conclusively say that those two bullets came from one gun and one gun only" because the bullets were made of different metals and would "pick up marks from the gun differently." He also noted that when a bullet passes through a hard substance, such as the sheet metal of a car, a metal or wood door, or bone, it is typical for some of the markings to be smeared or wiped away.

Agent Oakley McKinney, a forensic scientist and latent fingerprint specialist with the TBI, was accepted by the court as an expert in the field of fingerprint identification. Agent McKinney testified that he examined the Beretta firearm recovered from 5205 Ogundquit Lane and did not find any latent prints. He stated that the firearm had a dull or matte finish, which made it less likely to hold a fingerprint, and that it was "not uncommon to process a weapon such as this and not get a latent print." He said that the lack of latent prints did not mean the gun was not handled. Agent McKinney recalled that he was given a known fingerprint impression for Cedric Stanley; however, he did not conduct any comparisons because, as already noted, no latent prints were developed off the firearm.

Agent James Russell Davis, II, a forensic scientist assigned to the microanalysis section of the TBI Crime Laboratory, was accepted by the court as an expert in the field of gunshot residue and microanalysis. Agent Davis testified that he analyzed a gunshot residue kit performed on the hands of Cedric Stanley and sent to him by the Memphis Police Department. The results were inconclusive, meaning he could not eliminate the possibility that Cedric fired, handled, or was near a gun when it was fired. He said that it was very common to get inconclusive results on shooting

victims because "gases with this microscopic soot within it, is made to push the bullet down the barrel and if someone is hit by that bullet, that means the material behind it is coming towards them . . . [and,] generally, people's hands are not going to be in their pockets all the time."

Agent Davis testified that he also received a "SEM tab" from the medical examiner's office. He explained that "SEM" stood for scanning electron microscope and was the way of analyzing inanimate objects for the microscopic soot particles that make up gunshot residue. He elaborated that a disc with double-sided sticky tape is moved across the object and then he checks the disc for soot particles. His analysis "did not reveal the presence of particles of gunshot primer residue." He could not comment on the normalcy of the results because he did not know exactly what item was sampled or how far the item was from where the weapon discharged. He noted that the descriptive material sent with the sample said it came from the shoulder of a jacket but did not indicate whose jacket or which shoulder.

Dr. Kenneth Snell, former Deputy Chief Medical Examiner for Shelby County and an expert in forensic pathology, testified that he performed the autopsies of Cedric Stanley and Mark Collins. Dr. Snell noted that Cedric suffered a gunshot wound to the back side of his right upper arm and that the bullet went out and back into his arm before entering his chest cavity. Once in the chest cavity, the bullet "got the right lung, severed blood vessels in the upper chest and neck area," and lodged in the left shoulder area where a medium caliber projectile was recovered. The external wound had no soot or stippling around it, meaning the gun was a distance from the body or some sort of clothing prevented soot from landing on the wound. Dr. Snell also did not see any powder or soot on Cedric's clothing. Given the caliber of the projectile and the lack of soot or stippling, Dr. Snell estimated that the gun was a minimum of six inches away when fired.

Dr. Snell testified that Collins suffered a gunshot wound to the right side of his head that exited out the left side on "a slight downward angle." He noted there was no soot or powder stipple associated with the wound, meaning the shot came from an indeterminable range.

Officer Hope Smith, a crime scene investigator with the Memphis Police Department, testified that she was called to the scene of a shooting at 3425 South Mendenhall Road on January 9, 2006. Officer Smith photographed the scene, marked the evidence, and assisted her partner in taking measurements. At trial, Officer Smith identified various photographs and evidence taken from the scene. In particular, she noted a large "baggie" that contained three "baggies" of what appeared to be marijuana and a small silver scale lying approximately ten feet from the Cadillac; spent bullet casings; and live nine-millimeter bullets. Officer Smith observed from photographs of the scene that the Cadillac appeared to block pedestrian traffic on the sidewalk. After looking at her crime scene report, Officer Smith recalled that the driver's side window of the car was completely broken out and said she would have noted if other windows were broken out. Officer Smith stated that there was a secondary crime scene approximately one street west of the scene of the shooting where officers recovered several "clear plastic baggies containing what appeared to be tobacco" and two other clear plastic "baggies" against a fence. Officer Smith said that there was an apartment complex on the other side of the fence from the secondary crime scene.

Sergeant Anthony Mullins of the Memphis Police Department testified that he responded to a scene at 3425 South Mendenhall Road on January 9, 2006. Sergeant Mullins noted that the southbound lanes of the road were blocked with emergency vehicles, a red or burgundy colored Cadillac was in the driveway, and a body was lying on the ground outside the Cadillac. A perimeter around the crime scene was already secured when he arrived. The Cadillac was later taken to the crime scene office for further processing, during which, among other things, rods were placed through bullet holes in the interior of the car to determine the trajectory of the gunshots. Sergeant Mullins noted that a shot appeared to have "com[e] from outside the right rear door inside the car." He also noted that the driver's side window was shattered, and both windows on the passenger's side were rolled down. Sergeant Mullins said that no weapons were found in the car.

Sergeant Mullins testified that the defendant's name did not surface as a suspect until two or three days into the investigation. He said that they checked Cedric's cell phone for incoming and outgoing calls and developed persons of interest based on those calls. Upon finding the defendant's number in Cedric's call log, the officers put the defendant's photograph in an array, from which Edward identified the defendant as the gunman. Based on Edward's identification, Sergeant Mullins and several other officers went to the defendant's residence at 5205 Ogundquit Lane to arrest the defendant the evening of January 12, 2006. A consensual search of the residence revealed a nine-millimeter Beretta handgun with rounds in the magazine belonging to the husband of the defendant's sister, who told Sergeant Mullins that he had a weapon in the house and that it could be found "inside a laundry basket with some clothing on top and around it."

Sergeant Mullins testified that the defendant was taken into custody around 7:30 p.m., and, in the presence of the defendant's father, questioning started approximately three hours later. Officers questioned the defendant for two hours and the typing of his statement took another two hours. Sergeant Mullins characterized the amount of time the defendant spent in the homicide office as "average." In his statement, the defendant admitted that he was responsible for the deaths of Cedric and Collins, that he used a black and silver nine-millimeter handgun, that he fired five shots, and that no one else fired any shots. He claimed he did not know where the gun was, saying he must have lost it when he was running. He stated that a young man named "Tone"[3] was with him and described him as "bright and about six feet or five eleven or something like that. He had a little fro on his head." In his statement, the defendant explained that:

> Cedric called me and asked me did I have an ounce of marijuana and I told him yes. And he asked me could I meet him somewhere so he could get it. I told him I didn't know because I was dropping off my applications trying to get a job. A couple minutes later I called Cedric back and told him yes, I could meet him. Me and [Cook] was walking up Mendenhall so I could take my application up to Rally's. That is when [Cook] said let's turn around so that I can go get me some more shoes.

---

[3] The defendant later testified at trial that Tone's name is Marvel Cook; therefore, we will hereinafter refer to him as Cook.

So we turned around. As we turned around, that's when Cedric and the other two guys pulled up in the car. They started reaching for their guns. I seen Cedric try to open the door with a gun in his right hand. I seen the guy in the front passenger seat pull a gun from under the seat. I seen the driver pull a gun out of his pants and I feared for my life so I started shooting.

Further reciting the contents of the defendant's statement, Sergeant Mullins stated that the defendant said he ran to a gas station down the street and then went home after the shooting. The defendant stated that prior to Cedric's calling and asking him for marijuana, he had no other contact with him that day. He said he had sold Cedric marijuana on one prior occasion, but they did not consummate a sale that day. The defendant did not know where Cook was during the shooting and said their only contact since the shooting was when Cook came to his house to borrow a compact disc and a hat. He recalled that he and Cook discussed calling the police but "thought that they would look at [them] as the bad people."

Sergeant Mullins acknowledged that, early in the interview, the defendant claimed the victims had pistols and that his actions were in self-defense; however, he acknowledged that the words "self-defense" were not in the defendant's typed statement. Asked if he told the defendant, "[Y]ou could have killed them because they had cell phones," Sergeant Mullins said he may have said something about cell phones but did not "remember giving [the defendant] an out by saying, [']Maybe you killed them because they had cell phones.[']" Sergeant Mullins said that during the course of the interview, he probably told the defendant what kind of sentence he faced. Sergeant Mullins stated that the defendant initially did not want to "give up" Cook.

**Defense Proof**

Earline Fitzgerald, resident of 3395 South Mendenhall Road, testified that when she arrived home around 4:00 or 4:30 p.m. on January 6, 2006, she saw a young man run by her, immediately followed by another young man who was walking quickly. She said that the second young man appeared to be tired and scared, and she asked him if he was all right. She remembered that he was wearing khaki pants, a red shirt, and a cap but did not get a good look at his face and did not recognize him to be anyone in the courtroom. Fitzgerald recalled that the young man responded, "No, ma'am. Some guys down there [are] trying to shoot me." In response, Fitzgerald went inside her house and called 911, during which she heard three gunshots. Fitzgerald later gave a statement to the police.

Asked about her statement, Fitzgerald recalled that she told the police she heard three gunshots while on the phone with the 911 operator. She also recalled telling the police that when she went to the scene, she saw a young man being taken away on a stretcher and he looked like the young man who had told her someone was trying to shoot him. She clarified, however, that she did not see the face of the young man on the stretcher, only that he appeared to be wearing red.

The defendant's father, Ceasar Johnson, II, testified that he lived in Mississippi in January 2006, while the defendant lived with one of his sisters in Memphis. Johnson was at his daughter's house when the police arrested the defendant on January 12, 2006. Johnson said the police arrived around 9:00 p.m. and "handled [the defendant] a little rough" even though he had already surrendered. The police kept Johnson at his daughter's house while they conducted a search of the residence, then took him to the police station. Johnson stated that he and the defendant signed an advisement of rights form after being at the police station for "[a] long while." Johnson recalled that they were taken into an interrogation room, and initially the defendant was questioned by Sergeant Mullins and then later by an African-American female officer. He remembered they were in the interrogation room for "a good while," and there was a board on the wall that Sergeant Mullins used to write the amount of time the defendant faced if found guilty.

Johnson testified that they subsequently went to another room where a woman was to type the defendant's statement. Asked to describe how the statement was taken, Johnson stated, "Pretty much it was taken the way they wanted to take it. They didn't want to let nothing he was saying." He explained that questions were asked "[m]any times" and the woman did not appear to type every question and answer. Johnson said he did not object to what was going on because he was afraid. He recalled it was "late" when they finished typing the statement.

Marco Parrot testified that he knew Cedric and Collins from school and "the streets in the neighborhood." He saw them after school, around 3:00 or 4:00 p.m., on January 9, 2006, when they stopped by his house to buy drugs. When shown photographs of Cedric and Collins, Parrot said he called them "Kinfolk," a gang-related term used by the Gangster Disciples, and did not know either of them by name. He identified Collins as the one who bought the drugs and said that "he bought . . . an ounce and then he hopped in the car, hopped out and bought another ounce."

Parrot stated that Collins told him that he had a "couple of people lined up . . . [to] pop cone on" later that day. Parrot explained that "pop cone" means to "get over in mind[,] like playing games," as in cheat, or "if that [does not] work, your next option is robbing." He acknowledged that in his statement to police, he started talking about "popping cone" right after he was asked about the last time he saw Cedric Stanley prior to his death. However, Parrot identified a mistake in his statement where it said that Cedric asked for two *pounds* of marijuana because he actually asked for two *ounces*. He conceded that he signed the statement, saying it was true and correct, but said he did not read it in its entirety because he was late for work. Parrot admitted that he was currently incarcerated because he "got a subpoena to court and . . . missed it" and that he had previously pled guilty to theft of property and aggravated assault.

Sergeant Caroline Mason of the Memphis Police Department testified that she participated in the questioning of the defendant on January 13, 2006, and was present when he signed the advice of rights form. She did not recall speaking with him for any length of time before he signed the form. Sergeant Mason explained that statements are taken in the squad room, not the interview room, and that Sergeant Mullins would have asked the questions and she would have typed the questions and the defendant's answers. She said that every question and answer related to the case

-9-

are supposed to be included in the typewriting, and had the defendant wanted anything about self-defense or other matters included in his statement, she would have typed it. Sergeant Mason acknowledged that Marco Parrot's statement of similar length took only an hour, but the defendant's statement took two hours. She explained that Parrot's was only a witness statement and that the need to verbally discuss the <u>Miranda</u> rights with a defendant sometimes makes the process take longer than with a witness. However, she acknowledged that they would have already discussed the defendant's rights prior to the interview process.

The defendant testified that, in January 2006, he was living with his sister on Ogundquit Lane in Memphis and was selling marijuana at that time. He acknowledged that Cedric Stanley called him on January 6, 2006,[4] asking to buy marijuana, but he told Cedric that he "was out looking for a job at the time." The defendant said that Marvel Cook, who was also known as "Tone," was with him and that he was specifically looking for employment at Rally's, a fast food restaurant. Before the defendant went to Rally's, he called Cedric back and told him he would bring the marijuana to him. He planned to sell Cedric an ounce of marijuana for $75 but had "a quarter pound" in a Ziplock bag on his person. The defendant explained that he kept the additional marijuana, as well as his money, in a pair of pants that he was wearing underneath his outer pants.

The defendant testified that he and Cook were walking on Mendenhall Road near a fire station when Cedric, Edward, and Collins drove up next to him and said, "Drop it off," meaning "it's a robbery." The defendant "threw [his] hands up," but "Cedric pulled [a] gun." The defendant and Cook ran down Mendenhall Road for about fifteen to seventeen feet, until the defendant saw a woman whom he asked to call the police "because some boys had just pulled a gun on [him]." The defendant said he was scared and in fear for his life. The defendant stated that he tried to get away but was "cut off" by the victims' car. He explained that the car pulled into a driveway, blocking his path, and the victims demanded that he "give them what [he] had, which was . . . money and . . . drugs."

The defendant said that the driver of the car, Edward Stanley, threatened to kill him, and he could see that all three men had guns. He noted that Cedric had a black and silver pistol, and Edward and Collins both had silver pistols. He offered to give them his drugs and money, and Edward told Cedric to "get out and get it" and the defendant "handed off the drugs." The defendant recalled, "Cedric Stanley was getting out of the car with the gun in his hand and I snatched the gun from him and Edward Stanley said shoot. That's when I let off fire because I was scared." The defendant stated that he had no intention of killing anyone before he grabbed the gun away from Cedric and that he did not have a gun on him that day.

The defendant testified that he fired the gun five times and then ran toward some apartments. He acknowledged that he was able to shoot all three victims without them firing a shot, even though

---

[4] The defendant was asked about events occurring on January 6th, but, again, it would appear from all the other evidence at trial that defense counsel meant to say the 9th.

they were allegedly armed. The defendant threw the gun away, ran to a gas station to catch his breath, and then ran home. He asked his sister to call the police and said she did so that night.

The defendant testified that he stayed in his house until the police arrested him on January 12, 2006. He said he went outside one day during the interim, but "somebody . . . rode down talking about what they'll do to me. So I went back in the house and stayed in the house." The defendant recalled that on the day he was arrested he was at home with his niece, sister, and father. He remembered that the police arrived around 7:00 p.m. and took him to an interrogation room at the police department where he was shackled to a table. He was in the room for "a couple of hours" with Sergeant Mullins, Sergeant Mason, and his father. The defendant said there was a blackboard on the wall on which Sergeant Mullins wrote down "how much time I can get if I wouldn't tell him what happened. And he had three stick men on the board. Two dead and one in critical condition."

The defendant testified that he told Sergeant Mullins that the shooting was in self-defense, but Sergeant Mullins was angry and told him to "[s]top lying." He recalled that Sergeant Mullins told him "[he] probably shot assuming that [the victims] probably just had cell phones," and Sergeant Mullins asked him, "Is it possible that you shot somebody because they had a cell phone?" The defendant explained that he wanted to give a statement and cooperate with the police because he "thought maybe they would have some slack on [him] if [he] told them what really happened." The defendant stated that he was not able to review his statement before he signed it, and once he did review it, he noticed that Sergeant Mason had not included everything he had told her. Specifically, he told the officers he had two run-ins with the victims that day, the first being when they tried to rob him and he ran away. However, Sergeant Mason did not put it in his statement. He asked Sergeant Mason if she was going to retype his statement, and she told him no. The defendant acknowledged that the idea he acted in self-defense was in his statement even if the actual words were not. The defendant recalled that they did not take any breaks during the typing of the statement and that Sergeants Mullins and Mason took only a two- to three-minute break during the interrogation.

Following the conclusion of the proof, the jury convicted the defendant of two counts of the lesser-included offense of voluntary manslaughter and one count of the lesser-included offense of attempted voluntary manslaughter.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first argues that the evidence was insufficient to convict him of voluntary manslaughter and attempted voluntary manslaughter because the proof showed his actions were in self-defense. When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979);

see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was charged with second degree murder, which is a knowing killing of another, see Tenn. Code Ann. § 39-13-210 (2006), and attempted second degree murder. However, the jury found him guilty of the lesser-included offenses of voluntary manslaughter and attempted voluntary manslaughter. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a). A person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a).

-12-

The defendant argues that the proof was insufficient to support his convictions because he was acting out of a well-founded fear of death or great bodily injury when he shot the victims. He is correct that a person who has reasonable fear of imminent danger, death, or serious bodily injury is justified in using force in self-defense to the degree necessary to protect against the other person's use of unlawful force. See Tenn. Code Ann. § 39-11-611 (2006). When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See id. § 39-11-201(a)(3); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Examining the evidence in the light most favorable to the State, we conclude the evidence is sufficient to support the defendant's convictions. The defendant admitted that he fired into Edward Stanley's car, killing Mark Collins and Cedric Stanley, and seriously injuring Edward Stanley. However, the defendant presented evidence at trial to suggest his actions were in self-defense. He testified that he was walking on a sidewalk when the three victims drove up next to him and tried to rob him. He said that all three victims had guns and that Cedric, specifically, "pulled [a] gun" on him, at which point he ran away. He stated that the victims chased him in their vehicle, finally blocking his path at a driveway. The defendant said that Cedric started to get out of the car with a gun in his hand, so he grabbed the gun from Cedric and then heard Edward say "shoot." It was then, according to the defendant, that he started shooting. The defendant also offered testimony from Earline Fitzgerald that a young man ran by her and told her that some other young men were trying to shoot him. However, Fitzgerald said that she did not get a good look at the young man's face and did not recognize him to be anyone in the courtroom.

Contrary to the defendant's evidence of self-defense, however, other evidence presented at trial indicated that the defendant was not in imminent danger of death or great bodily injury. Edward Stanley testified that none of the victims were armed and there were no weapons in the car. Sergeant Anthony Mullins testified that a search of the car revealed no weapons. Jessica Griffin, an eyewitness, testified that she did not see any weapons in the car when she arrived at the car immediately after the shooting. In addition, there is evidence that negates the defendant's allegation that Cedric was in the process of getting out of the car – the action that allegedly instigated the defendant's grabbing the gun. Susan Williams, an eyewitness, testified that all of the car doors were closed when she arrived at the car immediately after the shooting. Officer Timothy Steele, the first police officer on the scene, also testified that each of the car doors was closed when he arrived.

The jury heard all the evidence, assessed the credibility of the witnesses, and received a thorough instruction on the defense of self-defense. By its finding the defendant guilty of voluntary manslaughter and attempted voluntary manslaughter, it obviously determined that the defendant acted in a state of passion produced by adequate provocation but rejected his claim that he shot the victims out of "a well-founded fear of death or great bodily injury." It is not the province of this court to second-guess factual determinations made by the jury. Therefore, we conclude that the

evidence was sufficient to convict the defendant of voluntary manslaughter and attempted voluntary manslaughter.

## II. Sentencing

The trial court conducted a sentencing hearing in October 2007, during which Edward Stanley testified about his injuries and the impact of watching his brother die. He said that he did not agree "at all" with the defendant's being placed on diversion or probation. Rosalee Stanley, Edward and Cedric's mother, testified that "nothing ha[d] been the same since this incident." She said it would be an "insult[]" and "unjust" for the defendant to be granted probation or placed on diversion.

The defendant's father testified that the defendant was a good child and did "pretty fair" on his schoolwork. In December 2004, the defendant's mother died, and the defendant moved to Memphis to live with one of his sisters in order to "get away." He recalled that the defendant did not attend school in Memphis, explaining that the defendant "was on . . . a little break, he was going to go to Job Corp." He said that the defendant was raised in the church and that this incident "was a shock to everybody." He maintained that the defendant shot the victims in self-defense and was not a bad person.

The defendant testified that he dropped out of school in Mississippi to "get away from [his] mother's death and spend time with [his] sisters before . . . leav[ing] [to] go to Job Corp." He said he was in the eleventh grade going into the twelfth when he dropped out, and his grades consisted of "B's, C's every now and then." He stated that he had been close to his mother and could not focus after her death.

The defendant admitted that he got involved with the wrong crowd when he moved to Memphis and started selling drugs. He said he had earned "improvement" certificates in jail and had participated in Bible studies and "church call." He stated he had always been a religious person and had begun to "preach and minister the gospel" since his incarceration. The defendant testified that once he returned to society, he planned to get a ministry license.

The State also introduced victim impact statements, and the defendant introduced letters of support from friends, family, and school teachers.

At the conclusion of the sentencing hearing, the trial court enhanced the defendant's sentenced based on the defendant's "previous history of criminal behavior in that he was . . . a drug dealer when this came about," his use of a firearm during the commission of the offense, and having no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(1), (9), (10) (2006). The court found no mitigating factors. As such, the court sentenced the defendant to four and a half years on each of the voluntary manslaughter convictions and three years on the attempted voluntary manslaughter conviction. The court denied judicial

diversion, probation, or other alternative sentence and ordered that the sentences be served consecutively in the local workhouse, for an effective term of twelve years.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S .W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous. If our review reflects that the trial court, following the statutory sentencing procedure, imposed a lawful sentence, after having given due consideration and proper weight to the factors and principles set out under the sentencing law and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

### A. Manner of Service

The defendant argues that the trial court erred in denying judicial diversion, probation, or some type of alternative sentence. He submits that as a Range I offender, convicted of Class C and D felonies, he was a presumed favorable candidate for alternative sentencing options. Specifically, he argues that "his youth, lack of criminal record, and the mitigated nature and circumstances surrounding the crime strongly supported the appropriateness of placing [him] on judicial diversion," or, alternatively, that he was a suitable candidate for full probation. The State argues that the record

supports the trial court's denial of an alternative sentence. As discussed below, we agree with the State.

## 1. Judicial Diversion

Tennessee Code Annotated section 40-35-313 provides that, following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A) (2006). A qualified defendant is one who pleads guilty or is found guilty of a misdemeanor or Class C, D, or E felony; has not been previously convicted of a felony or a Class A misdemeanor; and is not seeking deferral for a sexual offense or a Class A or B felony. Id. § 40-35-313(a)(1)(B). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b). The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); Bonestel, 871 S.W.2d at 168. As such, it will not be disturbed on appeal absent an abuse of discretion. State v. Turco, 108 S.W.3d 244, 246 n.5 (Tenn. 2003). To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court considers (a) the defendant's amenability to correction, (b) the circumstances of the offense, (c) the defendant's criminal record, (d) the defendant's social history, (e) the defendant's physical and mental health, (f) the deterrence value to the defendant as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the defendant. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial, and how those factors outweigh other factors in favor of diversion. Electroplating, 990 S.W.2d at 229.

In denying diversion, the trial court stated that the defendant's amenability to correction was "just a big question mark" because he had never been employed, had dropped out of school, and had admitted selling drugs. The court noted that the defendant was in good physical and mental health and had "a horrible social history." The court also noted that the circumstances of the offense were extremely aggravated in that, with only "slight," if any, provocation, the defendant killed two teenagers and partially paralyzed a third. The court determined that the deterrence value to the defendant as well as others would be severely impaired because the case was highly publicized in the community, and judicial diversion "for this type of . . . purposeful killing" would not serve the interest of the public.

Despite the defendant's contention that several factors weighed in favor of diversion, the record shows that the trial court thoroughly considered and weighed the relevant factors. The record

supports the court's decision; therefore, we conclude the trial court did not abuse its discretion in denying judicial diversion.

## 2. Alternative Sentencing/Probation

As a standard offender convicted of Class C and D felonies, the defendant was presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6) (2006). Moreover, because he received a sentence of ten years or less, he was eligible for probation, and the trial court was required to consider probation as a sentencing option. Id. § 40-35-303(a), (b). However, although the defendant was entitled to the presumption of alternative sentencing, he was not automatically entitled to probation as a matter of law. See id. § 40-35-303(b). The burden was upon the defendant to show he was a suitable candidate for probation. Id.; see also State v. Summers, 159 S.W.3d 586, 599 (Tenn. Crim. App. 2004) (citing Ashby, 823 S.W.2d at 169); State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997) (stating that "[a] criminal defendant seeking full probation bears the burden on appeal of showing the sentence actually imposed is improper, and that full probation will be in both the best interest of the defendant and the public").

There is no bright line rule for determining when a defendant should be granted probation. State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by Hooper, 29 S.W.3d at 9-10. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Another appropriate factor for a trial court to consider in determining whether to grant probation is a defendant's credibility or lack thereof, as this reflects on the defendant's potential for rehabilitation. Id. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

The presumption in favor of alternative sentencing may be overcome by facts contained in the presentence report, evidence presented by the State, the testimony of the defendant or a defense witness, or any other source, provided it is made part of the record. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (2006).

In denying probation and sentencing the defendant to confinement, the trial court stated:

[T]he same social history where [the defendant is] apparently living a life of drugs and guns and did not avail himself for school or work. The facts and circumstances surrounding the offense and the nature and circumstances of criminal conduct involv[ed] [were] extremely aggravated. His lack of prior criminal convictions but having the history of selling drugs and those arrests I'm not going to hold against him.

So I find his previous action and character have not been good. And that he's not been a normal productive member of society. I can't expect at this point that he can be rehabilitated. I don't know what his potential is frankly. Although he says that he's found Jesus and all of that. Everybody tells me that. . . . But they all meet him there in the jail. And I cannot find that his testimony is . . . credibl[e].

Whether it appears that he'll abide by the terms of probation, I don't know. Just like so many other young men in our city that choose violence and drugs rather than school and work, I can't say that he would or won't, he's just a question mark to me. It's possible that he could but probably not.

I think the interest of society being protected from someone who would basically mow down teenagers in a car helpless is huge. We've not applied any less restrictive measures than confinement to him. He was seventeen, he's an unknown.

But I think a sentence of full probation would unduly depreciate the seriousness of the offense and would be a deterrent as well. And that this was a particularly enormous, gross and heinous offense. For that reason I find that probation is not suitable. I also find that an alternative sentence that the state has overcome the presumption of an alternative sentence by just the sheer facts and gall of this young man in committing these killings. Just absolutely purposeless killings.

The defendant argues that the court ignored the mitigating factors in denying his request for probation. In particular, he asserts that the circumstances of the offense were not excessive because he "was in a heightened emotional state when he reacted to a fear of death or great bodily harm," that he demonstrates great potential for rehabilitation, that full probation would not depreciate the seriousness of the offense, and that there was no need for deterrence beyond the need in every criminal case.

The record shows that the court did not ignore the mitigating factors but, instead, simply did not view them in the light the defendant desired. Our review indicates that the trial court thoughtfully considered all relevant facts, circumstances, and sentencing principles; and, thus, its findings as to the sentence are entitled to a presumption of correctness.

As set out above, the trial court determined, among other things, that confinement was necessary to avoid depreciating the seriousness of the offenses and to serve as a deterrent. The circumstances of the offenses, as established at trial, were that the defendant shot five times into a car containing three occupants, killing two of the young men and partially paralyzing the third, during the course of a failed drug deal. The court characterized these circumstances as extremely aggravated, "particularly enormous, gross and heinous." A court can deny an alternative sentence based solely upon the seriousness of the offense if "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring an alternative sentence. State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991) (internal quotations omitted); see also State v. Blackhurst, 70 S.W.3d 88, 98 (Tenn. Crim. App. 2001).

With regard to deterrence, the court noted that this case was highly publicized; a fact evidenced by discussions between counsel and the court concerning the admissibility of portions of a national documentary television show that chronicled the case. Moreover, the record indicates the prevalence of homicides in the jurisdiction. It was noted in the presentence report that Cedric Stanley and Mark Collins were the sixth and seventh homicide victims, respectively, in Memphis in 2006, and this incident occurred on January 9, 2006. In Hooper, 29 S.W.3d at 10, our supreme court outlined a non-exhaustive list of factors for determining whether a need for deterrence is present and whether incarceration is "particularly suited" to achieve that goal. These factors include:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole;

(2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior;

(3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;

(4) Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective; and

(5) whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

Id. at 10-12.

In addition, testimony concerning the defendant's social history at the sentencing hearing showed that the defendant dropped out of school in the eleventh grade and started selling drugs. The presentence report indicated that the defendant had no documented work history, and the counselor at the defendant's high school reported no record of his having attended that school. Furthermore, the court did not find the defendant's testimony credible as to his potential for rehabilitation. In light of the presumption of correctness attendant to the sentence imposed by the trial court, we conclude the evidence supports the trial court's denial of probation or other alternative sentence.

### B. Consecutive Sentencing

The defendant argues that the trial court erred in imposing consecutive sentences because the court "merely recited" the Wilkerson factors in classifying him as a dangerous offender. The State asserts that the trial court made the requisite findings.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

Here, the trial court's findings with regard to consecutive sentencing were as follows:

> Looking at concurrent and consecutive factors[,] I also find from predominately the nature of the offense and also the fact that [the defendant] is doing nothing with his life at all, had no intention of doing anything with his life as far as we can tell by the proof. That the circumstances surrounding the commission of the offense are aggravated.
>
> I also find that confinement for [an] extended period of time is necessary to protect society from his unwillingness to lead a productive life-style. Rather choosing guns and drugs and the street rather than work and school. And his resort to criminal activity in furtherance . . . of an anti-societal life-style. And I also find that if I ran all of these consecutively for a sentence of twelve years in the local workhouse, not the department of correction, that reasonably relates to killing a sixteen and a seventeen year old and part[ially] paralyzing another one.

So for that reason[,] I find these sentences should run consecutively because I find [the defendant] is a dangerous offender whose behavior indicates little or no regard for human life and that he had no hesitation about committing a crime in which [the] risk to human life was high.

In addition, the court noted that society needed to be protected from "someone who would basically mow down teenagers in a car helpless."

As observed by the trial court, the defendant resorted to a life of guns and drugs and, in the course of a failed drug deal, shot into a car five times acting on what the court considered "slight," if any, provocation. The defendant's actions culminated in the deaths of two young men and partial paralysis of a third. Upon review, we conclude the trial court made the detailed factual findings mandated by Wilkerson, and the record supports its determination that consecutive sentencing was appropriate.

**CONCLUSION**

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____

ALAN E. GLENN, JUDGE